**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| Marchonda Sanders | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: |
| | ) | |
| v. | ) | |
| | ) | |
| Howard County Board of Education | ) | |
| 10910 Clarksville Pike | ) | |
| Ellicott City, MD 21042 | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |
| | ) | |
| **SERVE:** | ) | |
| | ) | |
| Howard County Board of Education | ) | |
| In c/o Board Chair | ) | |
| 10910 Clarksville Pike | ) | |
| Ellicott City, MD | ) | |
| | ) | |

**COMPLAINT**

**COMES NOW**, Plaintiff Marchonda Sanders ("Mrs. Sanders"), by and through undersigned counsel, files this Complaint against the above-named Defendants and alleges as follows:

**INTRODUCTION**

This civil action arises from Defendant's failure to protect Plaintiff, an African American/Black female educator and math specialist, from foreseeable workplace violence, race and sex-based hostility, intimidation, disability discrimination, retaliation, interference with protected medical leave, and obstruction of workplace-injury rights.

On or about November 6, 2023, Plaintiff was physically assaulted, blocked from leaving a school conference room, verbally berated, intimidated, and humiliated by the white male parent of

1

a student while Plaintiff was performing her assigned duties at Bonnie Branch Middle School. Plaintiff was attacked at work by a parent who was later charged with disorderly conduct. Despite the parent's conduct, Defendant failed to take sufficient protective action and, upon information and belief, the Principal ultimately determined that he could not continue to keep the parent off school property. The parent and his wife then engaged in retaliatory conduct toward Plaintiff, including repeated false accusations against her. Defendant knew or should have known that Plaintiff was the victim of workplace violence and retaliation, yet took no meaningful action to protect her, failed to submit required injury documentation, failed to properly initiate a workers' compensation matter, interfered with her medical-leave rights, denied necessary disability accommodations, and subjected her to adverse treatment after she reported the incident and sought protection. Plaintiff suffered a medical emergency at work on or about December 8, 2023, which was determined to be a stroke and, upon information and belief, was stress-induced. Plaintiff's stroke was a direct result of the hostile working environment fostered by Defendant's agents and employees, including individuals acting with discriminatory and retaliatory intent. The stress and anxiety caused by Defendant's actions and omissions were significant and contributed to Plaintiff's medical emergency, hospitalization, and continuing disability-related impairments. Plaintiff was forced out of work for approximately one full academic quarter, approximately four months, and was not cleared to return to work until April 16, 2024, with medical restrictions. Even after Plaintiff returned to work, she could not perform her typical daily tasks without restrictions and accommodations. Upon Plaintiff's return, she met with her supervisor, union representative, and the school Principal, and Defendant imposed a series of rules governing Plaintiff's interactions with the parent and the parent's child, even though no charges were ever brought against Plaintiff and the parent had faced criminal charges.

Defendant's response placed burdens on Plaintiff, the victim of the assault, while allowing the parent to retain access to the school environment and continue exerting power over Plaintiff's employment conditions. After Plaintiff returned, the parent or parent's family again accused Plaintiff of misconduct; the accusation was investigated and shown to be false based on information from the child and a teacher in the building. This was at least the third false accusation made by the parent or parent's family against Plaintiff. Although the school ultimately defended Plaintiff after that investigation, Defendant failed to prevent the retaliatory pattern from continuing and failed to remedy the harm already caused. Plaintiff's medical providers later diagnosed her with symptoms associated with PTSD and anxiety-related conditions, major depressive disorder, and an eating disorder, and recommended leave and workplace accommodations arising from symptoms stemming from the work-related incident. Defendant denied or failed to honor necessary accommodations, causing Plaintiff to remain unable to return to work safely. Plaintiff brings this action to remedy discrimination, hostile work environment, retaliation, disability discrimination, failure to accommodate, FMLA interference and retaliation, race discrimination under 42 U.S.C. §§ 1981 and 1983, denial of equal protection, and related Maryland common law and statutory violations.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 because this action arises under federal law, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; 42 U.S.C. §§ 1981 and 1983; the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq.

2. This Court has supplemental jurisdiction over Plaintiff's related Maryland statutory and common law claims pursuant to 28 U.S.C. § 1367 because those claims arise from the same case or controversy as Plaintiff's federal claims.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the acts and omissions giving rise to Plaintiff's claims occurred in Howard County, Maryland, within the District of Maryland.

4. Venue is also proper because Defendant resides in and conducts business within the District of Maryland.

## LGTCA NOTICE

5. Plaintiff provided notice of her claims pursuant to the Local Government Tort Claims Act, Md. Code Ann., Cts. & Jud. Proc. §§ 5-301 et seq., and/or other applicable notice provisions.

6. Defendant had actual and constructive notice of Plaintiff's injuries, the November 6, 2023 assault, her internal reports, her Bully Report, the police report, the disorderly conduct charge against the parent, her leave requests, her workers' compensation-related communications, her medical restrictions, her accommodation requests, and her continuing damages.

7. Defendant is not prejudiced by Plaintiff's claims because Defendant had immediate knowledge of the incident, access to witnesses, access to school records, access to student and parent communications, access to internal reports, access to leave records, access to workers' compensation records, and the ability to investigate while the relevant facts were fresh.

8. To the extent Defendant contends that LGTCA notice was untimely or defective, Plaintiff pleads that Defendant had actual and constructive notice and that good cause exists for any alleged delay, including Plaintiff's disabling medical conditions, hospitalization, mental-health treatment, leave status, and Defendant's own interference with injury reporting, workers' compensation processing, FMLA, and accommodation procedures.

**PARTIES**

9. Plaintiff Marchonda Sanders is an African American/Black female educator who, at all relevant times, was employed by Defendant as a Math Specialist within the Howard County Public School System.

10. Plaintiff worked at Bonnie Branch Middle School in Howard County, Maryland.

11. Plaintiff was qualified for her position and performed her duties competently and professionally.

12. Plaintiff is identified in certain employment and leave records as Marchonda Evans and/or Marchonda Evans Sanders.

13. Defendant, Board of Education of Howard County ("the Board"), is a public body with corporate responsibility for the governance, oversight, operations, and employment policies of Howard County Public Schools (HCPS).

14. Defendant, Bonnie Branch Middle School under Howard County Public Schools ("HCCPS"), is a public educational institution operating under the authority of the Board.

15. John and Jane Doe Defendants are HCCPS supervisors, Human Resources managers, and administrative officials respectively, whose identities are presently unknown but who participated in or facilitated the discrimination, harassment, and retaliation alleged herein.

16. Defendant Board of Education of Howard County is a public body corporate and/or governmental entity responsible for operating, managing, supervising, and controlling the Howard County Public School System.

17. Defendant employed Plaintiff and exercised control over the terms, conditions, and privileges of her employment.

18. Defendant was responsible for maintaining a workplace free from discrimination, harassment, retaliation, intimidation, violence, disability-based mistreatment, and unlawful interference with protected medical leave.

19. Defendant was responsible for properly reporting workplace injuries and cooperating with workers' compensation processes.

20. Defendant was responsible for the acts and omissions of its agents, administrators, supervisors, employees, and representatives acting within the scope of their employment.

21. At all relevant times, Defendant received federal funds and was subject to federal civil rights obligations, including Title VII, the ADA, Section 504 of the Rehabilitation Act, Section 1981 as enforced through Section 1983, and the FMLA.

## FACTUAL ALLEGATIONS

**A. Plaintiff's Employment with the Howard County Public School System.**

22. Plaintiff, Marchonda Sanders, is an African American woman who was employed by Defendant Howard County Board of Education as a Mathematics Specialist within the Howard County Public School System ("HCPSS").

23. At all relevant times, Plaintiff worked at Bonnie Branch Middle School in Howard County, Maryland, where she supported mathematics instruction, student achievement, academic assessments, classroom accountability, and student learning interventions.

24. Plaintiff was qualified for her position, performed her duties competently and professionally, and was known within the school community as an educator who maintained high expectations for student conduct, academic integrity, and respectful engagement.

25. Plaintiff's race, color, sex, and professional role were known to Defendant, its administrators, supervisors, employees, students, and parents.

26. As an African American/Black female educator, Plaintiff should have been treated on equal terms with similarly situated employees, and provided with the same dignity, institutional support, and afforded to her peers.

27. Defendant was responsible for protecting Plaintiff from foreseeable workplace violence, parent aggression, racialized and gendered intimidation, retaliation, disability-based mistreatment, and interference with leave and workplace-injury rights.

28. Following the November 6, 2023 assault and the medical events that followed, Defendant knew or should have known that Plaintiff had serious work-induced medical conditions requiring leave, accommodation, workplace support, and protection from further harm.

**B. Events Preceding the November 6, 2023 Parent Confrontation And Assault.**

29. On or about November 6, 2023, during fifth period, Plaintiff was assigned to administer a Math Cool Down assessment for student ("EJ"), a minor, at Bonnie Branch Middle School.

30. Plaintiff was asked to proctor the assessment at the request of the student's teacher because the student had chosen to be isolated from his peers and his ordinary math classroom after allegedly shouting racial insults at a substitute math teacher of Indian descent.

31. Plaintiff's role was limited to administering and monitoring the assessment consistent with school policy and appropriate student-supervision practices.

32. Before the assessment, Plaintiff maintained clear academic and behavioral expectations and communicated those expectations to the student EJ and his parents by email.

33. Plaintiff's email was professional, appropriate, and consistent with her responsibilities as a Mathematics Specialist and school employee.

34. Upon information and belief, however, the student's parents responded to Plaintiff's email with hostility, contempt, intimidation, and an unwillingness to respect Plaintiff's authority as an African American/Black female educator.

35. Defendant and school leadership knew or should have known before the confrontation that the student's father, Mr. Jones, was upset with Plaintiff and hostile toward her because of her professional communications and enforcement of student expectations.

36. Despite that knowledge, Defendant failed to take reasonable steps to prevent a foreseeable confrontation, failed to arrange adequate support or supervision, and failed to protect Plaintiff while she performed assigned duties on school property.

37. While Plaintiff was waiting in the main office for the bell to ring, Mr. Jones, a white/Caucasian male and the student's (EJ's) father, arrived at the school.

38. Mr. Jones did not engage with Plaintiff in the main office and instead proceeded to the Student Services Office a few minutes before the bell.

39. Plaintiff allowed additional time for Mr. Jones and the student to settle into the conference room before entering, then entered only to fulfill her assigned responsibility as the exam proctor.

40. Upon entering the conference room, Plaintiff informed Mr. Jones and the student that she was present as the exam proctor, and both acknowledged her presence.

41. During the assessment, the student whispered something to Mr. Jones, after which Mr. Jones abruptly stated, "EJ doesn't want you in here, you have to leave. I can find someone else to proctor. He could proctor, do you think he will cheat?"

42. The student immediately refuted his father's statement and responded loudly, "No I did not say that!"

43. Mr. Jones then shifted his position and asserted that the student wanted him to leave, but the student clarified, "I want both of y'all to leave so I can take this [test] by myself."

44. Despite the student's own clarification, Mr. Jones continued to insist that Plaintiff leave the room, suggested that the student could take the assessment alone, and questioned whether Plaintiff's presence was based on a belief that the student would cheat.

45. Plaintiff calmly explained that, consistent with school policy and appropriate student-supervision practices, students are not permitted to be left alone in a room during an exam and that the purpose of a proctor is to monitor the assessment.

46. Mr. Jones responded aggressively and dismissively, stating, "Well I will talk to you later about your email."

47. Plaintiff, remaining professional, responded that there was nothing further to discuss.

48. After the student completed the assessment, Plaintiff asked Mr. Jones to confirm that the student was finished. Mr. Jones responded affirmatively and handed over the completed assessment. Plaintiff did this because she saw that the student erased every answer he wrote and put his head down.

49. Plaintiff thanked him and began to leave the room so that Mr. Jones could proceed with math instructions for the student.

50. As Plaintiff attempted to exit, Mr. Jones approached her and demanded, "You are going to talk to me, let's go!"

51. Plaintiff declined and again stated that there was nothing to discuss.

52. Mr. Jones then physically pushed Plaintiff into a table, causing her to misstep backward and nearly fall to the ground.

53. After pushing Plaintiff, Mr. Jones positioned his body in front of the door and blocked Plaintiff's exit, preventing her from leaving the room.

54. Mr. Jones's conduct physically confined Plaintiff in the conference room and forced her to remain in close proximity to the same parent who had just pushed her.

55. Mr. Jones continued demanding that Plaintiff speak with him about the email she had sent, while Plaintiff repeatedly stated that she had nothing further to add.

56. Mr. Jones then closed in on Plaintiff's personal space, yelled at her, and repeatedly questioned her authority, stating words to the effect of, "You are going to talk to me, who do you think you are."

57. Mr. Jones stood so close to Plaintiff that she could smell his breath and feel him spitting in her face while he yelled.

58. Mr. Jones also referenced a text from Mrs. Nitsch and challenged Plaintiff's authority by asking, "Who do you think you are, do you run this school, are you the Assistant Principal?"

59. Plaintiff attempted to maintain her composure and responded, "You read the email," while trying to exit the room.

60. When Mr. Jones became aware that other students and faculty were observing his behavior, he raised his hands and turned sideways, but still did not provide Plaintiff a clear and safe exit.

61. Plaintiff was forced to crawl between Mr. Jones and a recycling bin to escape the room.

62. While Plaintiff attempted to escape, Mr. Jones intentionally pushed her again.

63. Plaintiff was humiliated, intimidated, physically harmed, and placed in fear for her safety while performing assigned duties in a school building.

64. Other staff members in the Student Services Office observed, witnessed, or became aware of the confrontation, but failed to intervene, failed to call for immediate assistance, failed to remove Mr. Jones, failed to protect Plaintiff, and failed to ensure her safety.

65. Defendant's employees permitted Plaintiff to be physically intimidated, obstructed, berated, and humiliated in the workplace while she was performing her assigned duties.

66. The incident occurred on school property, during work hours, in the presence or awareness of Defendant's agents, and under circumstances that Defendant could and should have prevented.

**C.  HCPSS's Response to the Assault and Failure to Protect Plaintiff.**

67. After the incident, Mr. Jones took the student outside for a walk, while Plaintiff was left to process the assault and intimidation without meaningful institutional protection.

68. Plaintiff feared further retaliation and immediately reported the incident to the School Principal, a white/Caucasian male.

69. Rather than treating Plaintiff as the victim of workplace violence, the Principal minimized the assault and later that day in the hallway the Principal stated, "I thought he met his match coming at you!"

70. The Principal's statement trivialized Plaintiff's fear, physical injury, humiliation, and the danger she had just experienced.

71. The statement also reflected a racialized and gendered stereotype that Plaintiff, as an African American/Black woman, was expected to absorb aggression, intimidation, and confrontation without meaningful protection.

72. Plaintiff filed a Bully Report detailing what happened with Mr. Jones and also filed a police report seeking protection, including a restraining order.

73. Mr. Jones was later charged with disorderly conduct by the District, confirming the seriousness of the incident and Defendant's notice that Plaintiff had been subjected to threatening and disorderly conduct on school property.

74. Upon information and belief, the disorderly conduct charge was associated with Policy 100 and/or conduct rules applicable to disorderly behavior on school property.

75. Despite the seriousness of Mr. Jones's conduct, Defendant failed to press charges, failed to take adequate protective action, and failed to meaningfully investigate the assault and intimidation.

76. Upon information and belief, the Principal later determined that he could not continue to keep Mr. Jones off school property.

77. Defendant thereby allowed Mr. Jones to retain access to school property and to continue affecting Plaintiff's work environment, even though he had physically pushed, obstructed, intimidated, and berated Plaintiff while she was performing her duties.

78. Defendant failed to ban, restrict, supervise, or otherwise control Mr. Jones's access to Plaintiff and the school environment in a manner sufficient to protect Plaintiff from further intimidation or retaliation.

79. Defendant also failed to preserve evidence, conduct a complete witness investigation, review available video footage, issue meaningful protective directives, or take prompt corrective action.

80. Based on the circumstances, Plaintiff felt that her safety, dignity, and authority were subordinate to the preferences and access of the Caucasian/White parent who had assaulted and intimidated her.

**D. Continuing Access Granted to the Parent Following the Assault.**

81. Despite receiving notice of the incident and the resulting criminal charge, Defendant permitted the parent to continue accessing school property and participating in school activities.

82. Plaintiff was notified by the male band teacher, that Mr. Jones was taking pictures of Plaintiff while she was working at the school.

83. After Plaintiff reported the assault and sought protection, the student's parent, specifically initiated a series of complaints against her.

84. After Plaintiff reported the incident, the student's mother, Mrs. Jones, began engaging in retaliatory conduct toward Plaintiff.

85. Mrs. Jones filed a false Bully Report alleging that Plaintiff had harassed her son.

86. The student voluntarily told the School Principal that "Mrs. Sanders has never done anything to me!"

87. Despite the student's statement, Defendant failed to promptly and publicly clear Plaintiff's name, failed to protect Plaintiff from retaliatory accusations, and failed to take action sufficient to stop the parent family's continuing retaliation.

88. After Plaintiff returned to work, the parent or parent's family again accused Plaintiff of misconduct.

14

89. That accusation was false and was undermined by information from the student and a teacher in the building.

90. Upon information and belief, this was at least the third false accusation made by the parent or the parent's family against Plaintiff.

91. Although the school ultimately defended Plaintiff after investigating the later false accusation, Defendant allowed the retaliatory pattern to continue and failed to prevent additional harm.

92. Defendant's failure to stop the retaliatory accusations forced Plaintiff to continue working under the threat that any interaction with the parent or student could be weaponized against her.

93. Defendant permitted Plaintiff, the victim of the assault, to remain under a cloud of suspicion while the parent who had been charged with disorderly conduct retained the ability to access the school community and influence Plaintiff's work environment.

94. Defendant's conduct caused Plaintiff humiliation, anxiety, emotional distress, reputational harm, and a profound loss of safety and security in her workplace.

**E.   Failure to Report and Properly Process Plaintiff's Workplace Injury Claim.**

95. Plaintiff suffered an accidental personal injury arising out of and in the course of her employment on November 6, 2023.

96. Plaintiff's injury occurred while she was performing assigned work duties on Defendant's premises, during the school day, and while acting in furtherance of Defendant's educational mission.

97. Plaintiff promptly reported the assault, physical injury, intimidation, and resulting harm to school leadership, placing Defendant on actual notice that she had been injured at work.

98. Defendant also had actual notice that Plaintiff's injuries arose from a workplace incident involving a parent on school property.

99. Despite this knowledge, Plaintiff asserts that the school never submitted the required incident report necessary to begin a workers' compensation matter in the State of Maryland.

100. Defendant had an obligation to document, preserve, and process Plaintiff's workplace injury in a manner that did not obstruct, delay, or impair her statutory rights.

101. Defendant failed to submit or properly submit the incident report, first report of injury, and/or other documentation necessary to initiate and preserve Plaintiff's workers' compensation rights.

102. Defendant's failure prevented the ordinary initiation and processing of Plaintiff's Maryland workers' compensation matter.

103. As a result, Plaintiff's workers' compensation claim was denied, dismissed, delayed, impaired, or otherwise compromised.

104. Defendant's failure deprived Plaintiff of the benefit of a timely claim investigation, timely claim recognition, timely medical authorization, timely wage-loss review, and timely preservation of evidence.

105. Defendant had notice of Plaintiff's injury no later than November 6, 2023, when Plaintiff reported the assault to the Principal and other school officials.

106.    Defendant received additional notice when Plaintiff filed the Bully Report, filed a police report, sought protection, and when Mr. Jones was charged with disorderly conduct.

107.    Defendant received further notice when Plaintiff suffered a stroke at Bonnie Branch Middle School on December 8, 2023, requested medical leave, submitted medical documentation, and later communicated with Defendant concerning workers' compensation.

108.    On or about May 8, 2024, HCPSS Workers' Compensation Specialist Justin Waters emailed Plaintiff regarding a denial letter that had been sent in January 2024.

109.    In that email, Mr. Waters stated that the adjuster who investigated Plaintiff's claim was Casie Walsh and provided contact information for the adjuster.

110.    The May 8, 2024 email confirms that Defendant knew of Plaintiff's workers' compensation-related claim, knew that an adjuster had been assigned, and knew that Plaintiff's claim had been denied or otherwise adversely affected.

111.    Despite this knowledge, Defendant failed to correct the reporting deficiency, failed to ensure that Plaintiff's claim was properly initiated, failed to support an accurate record of the workplace injury, and failed to prevent Plaintiff's claim from being denied or impaired based on deficiencies attributable to Defendant.

112.    Defendant's own records, communications, and workers' compensation correspondence establish that Defendant had actual and constructive notice of Plaintiff's workplace injury, the November 6, 2023 incident, and Plaintiff's related damages.

113.    Defendant's failure to properly submit and correct required workplace-injury documentation interfered with Plaintiff's ability to obtain workers' compensation benefits and remedies for her workplace injury.

114.    Defendant's handling of Plaintiff's workers' compensation matter was retaliatory and occurred after Plaintiff reported workplace violence, requested protection, sought medical leave, and asserted rights related to her work-induced medical conditions.

115.    Defendant's conduct would discourage a reasonable employee from reporting a workplace injury or pursuing workers' compensation benefits.

116.    Defendant's failure to process Plaintiff's claim was not an isolated clerical mistake; it occurred in the broader context of Defendant minimizing Plaintiff's assault, refusing to protect her, allowing retaliatory accusations to continue, and treating Plaintiff as the problem after she was attacked.

117.    Defendant's conduct caused Plaintiff economic damages, wage-loss damages, medical-expense damages, benefit-related damages, emotional distress, and additional consequential harm.

**F.  Plaintiff's Stroke, Leave Status, and Medical Restrictions.**

118.    On December 8, 2023, approximately one month after the assault, Plaintiff suffered a stroke while at work at Bonnie Branch Middle School.

119.    Defendant's failure to protect Plaintiff, combined with the stress of the hostile and retaliatory work environment, caused and/or contributed to Plaintiff's physical and emotional injuries.

120. Plaintiff was rushed from the school to the emergency room by ambulance and was hospitalized for approximately three days.

121. After testing, Plaintiff was informed that the stroke was stress-induced.

122. Plaintiff's stroke was a direct result of the hostile work environment fostered by individuals with discriminatory and retaliatory intent.

123. The stress and anxiety caused by Defendant's actions and omissions were significant and contributed to Plaintiff's medical emergency.

124. Plaintiff's hospitalization and medical condition placed Defendant on notice that Plaintiff had a serious health condition and required medical leave, workplace support, and protection from further stressors.

125. On or about January 11, 2024, Defendant issued a leave-of-absence determination approving Plaintiff for General Leave—Personal Illness.

126. The January 11, 2024 determination stated that Defendant had received medical documentation on December 22, 2023 and approved leave beginning December 8, 2023, with an anticipated leave end date of January 15, 2024.

127. Defendant's January 11, 2024 determination confirms Defendant's actual notice of Plaintiff's serious health condition beginning on the date of the stroke.

128. Plaintiff ultimately remained out of work for approximately one full academic quarter, about four months.

129.    On or about April 10, 2024, Defendant issued correspondence stating that Plaintiff had been approved for General Leave—Personal Illness from December 8, 2023 to April 7, 2024.

130.    The April 10, 2024 correspondence acknowledged receipt of documentation from Plaintiff's healthcare provider on April 1, 2024 and stated that Plaintiff was released to return to work on April 16, 2024, with restrictions through May 16, 2024.

131.    Those restrictions included no lifting more than ten pounds, no more than thirty minutes of standing, and the need for a chair at all times.

132.    Defendant directed Plaintiff to return from leave at her normal start time on April 16, 2024.

133.    Defendant further warned that if Plaintiff failed to return to work, it would be construed as a lack of interest in continued employment and that Plaintiff would be required to reimburse HCPSS for medical and health premiums paid during FMLA leave.

134.    Defendant's April 10, 2024 correspondence pressured Plaintiff to return despite her recent stroke, continuing restrictions, and ongoing need for workplace support.

135.    Plaintiff returned to work on or about April 16, 2024, but remained medically restricted and unable to perform her typical daily tasks without limitation and accommodation.

136.    Upon her return, Plaintiff met with her supervisor, union representative, and the Principal.

137.    During that meeting, Defendant imposed multiple rules regarding Plaintiff's interactions with Mr. Jones and the student.

138.    Those rules placed burdens and restrictions on Plaintiff, even though Plaintiff was the victim of the assault, no charges had been brought against her, and Mr. Jones had faced criminal charges.

139.    Defendant's return-to-work process failed to adequately account for Plaintiff's medical restrictions, trauma-related limitations, and need for a safe, structured, and non-retaliatory environment.

140.    Instead of ensuring that Plaintiff could return to work with dignity and protection, Defendant placed responsibility on Plaintiff to navigate the presence and influence of the same parent family that had assaulted, intimidated, and retaliated against her.

### G.  Continuing Medical Treatment, FMLA Leave, and Disability-Related Limitations.

141.    Plaintiff continued to suffer the lasting physical, neurological, psychological, and functional effects of the November 6, 2023 assault, the hostile work environment, and the December 8, 2023 stroke.

142.    Plaintiff's conditions included trauma-related anxiety, depression, cognitive overload, physiological stress responses, and other impairments that substantially limited major life activities and affected her ability to function in high-stimulus, unpredictable, or unstructured workplace settings.

143.    On or about January 27, 2025, Defendant approved Plaintiff for continuous FMLA—Personal Illness.

144. The January 27, 2025 letter identified an approved leave start date of November 6, 2024, an anticipated leave end date of March 2, 2025, and stated that Plaintiff would need a medical release to return to work.

145. The letter further stated that Plaintiff's sixty-day FMLA entitlement would end on February 19, 2025, that General Leave would begin on February 20, 2025, and that Plaintiff's position would be declared a vacancy on February 20, 2025.

146. Defendant's decision to declare Plaintiff's position vacant while she remained medically impaired and on protected or medically necessary leave was an adverse employment action.

147. The vacancy declaration was causally connected to Plaintiff's need for FMLA leave, disability-related leave, and workplace support.

148. Plaintiff later entered treatment at Center for Discovery.

149. On or about February 24, 2025, Plaintiff began Partial Hospitalization Program treatment after regressing at the Intensive Outpatient Program level of care.

150. Plaintiff's providers diagnosed her with Other Specified Eating Disorder, Post-Traumatic Stress Disorder, Major Depressive Disorder, and Generalized Anxiety Disorder.

151. Plaintiff attended treatment five days per week, from approximately 12:00 p.m. to 7:00 p.m., and was medically unable to attend work.

152. Plaintiff's providers explained that her eating disorder and comorbidities severely impaired activities of daily living, including eating, and could impair concentration, attention, memory, and cognitive functioning.

153.    Plaintiff was not medically cleared to work at that time.

154.    On or about May 5, 2025, Plaintiff began Intensive Outpatient Program treatment at Center for Discovery.

155.    Plaintiff made progress at the Intensive Outpatient Program level of care and was expected to be discharged from the program on or about July 9, 2025, with continued outpatient support.

156.    Plaintiff was previously cleared to return to work effective June 16, 2025, provided that accommodations were honored.

157.    Plaintiff's requested accommodations were necessary to support significant symptoms consistent with a trauma-related anxiety disorder stemming from the work-related incident.

158.    Plaintiff's symptoms included episodic dysregulation, cognitive overload, and physiological responses to environmental stressors.

159.    Plaintiff's symptoms significantly impaired her ability to function in high-stimulus, unpredictable, or unstructured workplace settings.

160.    Plaintiff's providers recommended that HCPSS reconsider the proposed accommodations and make a good-faith effort to align workplace supports with Plaintiff's documented clinical needs.

161.    Defendant denied or failed to honor Plaintiff's requested accommodations.

162.    Because Defendant denied the accommodations, Plaintiff was unable to return to work.

163.	Due to the accommodation denial, Plaintiff required an extension of leave until at least August 10, 2025, at which time her outpatient team would evaluate her ability to return to work and any further accommodations needed.

164.	Defendant's refusal to provide necessary workplace supports compounded the harm caused by the original assault and reinforced the message that Plaintiff, rather than the offending parent family or Defendant's inadequate response, would bear the consequences of the workplace violence.

## H. Unequal Treatment, Retaliation, and Adverse Employment Actions.

165.	Following the assault, Plaintiff was subjected to adverse treatment after reporting workplace misconduct, seeking medical leave, pursuing workers' compensation benefits, and requesting disability accommodations.

166.	Defendant failed to treat Plaintiff on equal terms with similarly situated employees.

167.	Defendant failed to provide Plaintiff the protection, support, and institutional response afforded to employees who had not engaged in protected activity or sought workplace protections.

168.	Defendant failed to take prompt and effective corrective action in response to Plaintiff's reports of assault, retaliation, and discrimination.

169.	Defendant permitted conditions to persist that interfered with Plaintiff's ability to perform her job and safely remain employed.

170.	Defendant's actions and omissions materially altered the terms, conditions, and privileges of Plaintiff's employment.

171.     Defendant's conduct would discourage a reasonable employee from reporting workplace misconduct, pursuing workers' compensation benefits, requesting accommodations, or exercising rights protected by federal and state law.

172.     Defendant's actions were undertaken with knowledge of Plaintiff's protected activity, medical condition, and requests for assistance.

173.     Defendant's actions caused Plaintiff economic loss, emotional distress, and damage to her professional standing.

174.     Plaintiff incurred medical expenses, lost wages, and other consequential damages.

175.     Plaintiff suffered physical injury and continuing impairment.

176.     Plaintiff suffered emotional distress, anxiety, depression, and related psychological injuries.

177.     Plaintiff continues to suffer damages as a direct and proximate result of Defendant's conduct.

178.     Plaintiff was treated less favorably because of her race, color, sex, disability, protected activity, workplace-injury reports, and need for medical leave.

179.     Defendant failed to afford Plaintiff the same protection, dignity, credibility, and support that it would have afforded a similarly situated white employee, male employee, non-disabled employee, or employee who had not complained of workplace violence and discrimination.

180.    Defendant's response was shaped by stereotypes about African American/Black women, including stereotypes that they are aggressive, confrontational, resilient to abuse, or less deserving of protection.

181.    Defendant's failure to intervene, failure to investigate, failure to protect, and failure to correct retaliatory accusations ratified the hostile and discriminatory conduct Plaintiff experienced.

182.    Defendant knew or should have known that Plaintiff was subjected to severe physical intimidation, humiliation, and retaliation by a parent and the parent's family on school property.

183.    Defendant failed to take prompt, effective, and adequate remedial action.

184.    Defendant's conduct altered the terms and conditions of Plaintiff's employment and created an abusive, unsafe, and retaliatory working environment.

185.    Defendant's actions would dissuade a reasonable employee from reporting discrimination, workplace violence, safety concerns, disability-related limitations, workers' compensation issues, or requests for protected leave.

186.    As a direct and proximate result of Defendant's conduct, Plaintiff suffered physical injury, a stress-induced stroke, hospitalization, trauma-related symptoms, anxiety, depression, eating-disorder-related impairment, lost wages, lost benefits, impairment of workers' compensation rights, reputational harm, emotional distress, and other damages.

**COUNT I: 42 U.S.C. § 1981 (through § 1983) – RACE DISCRIMINATION**

187. Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

188. A *prima facie* case of race discrimination requires a showing of four (4) elements: (1) Plaintiff is a member of a protected class; (2) Plaintiff was qualified for the position; (3) Plaintiff suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.

189. Here, the four (4) elements of a *prima facie* case of race discrimination are met. At all relevant times, Defendant acted under color of state law and controlled the terms, conditions, and privileges of Plaintiff's employment.

190. Section 1981 guarantees all persons the same right to make and enforce contracts and to enjoy the benefits, privileges, terms, and conditions of the contractual relationship as enjoyed by white citizens.

191. Plaintiff's employment relationship with Defendant constitutes a contractual relationship protected by Section 1981.

192. Plaintiff is Black/African American woman who was qualified for her position and performed her duties competently and professionally and was known within the school community as an educator who maintained high expectations for student conduct, academic integrity, and respectful engagement.

193. After Plaintiff was assaulted by a parent while performing her assigned duties, Defendant failed to provide Plaintiff the protection, support, credibility, and institutional response afforded to similarly situated employees outside Plaintiff's protected racial class.

194.     Defendant minimized Plaintiff's reports, failed to provide meaningful protection, failed to adequately investigate the incident, permitted the offending parent continued access to the school environment, and imposed restrictions upon Plaintiff rather than upon the individual who assaulted her.

195.     Defendant further failed to stop retaliatory complaints directed at Plaintiff and allowed those complaints to continue despite evidence that the allegations against Plaintiff were false.

196.     Defendant treated Plaintiff less favorably than similarly situated employees because of her race, and failed to provide Plaintiff the protection, credibility, support, investigation, and institutional response that would have been provided to similarly situated non-Black employees.

197.     Defendant's actions were intentional and were motivated, at least in part, by racial bias, racial stereotypes, or deliberate indifference to race-based discrimination.

198.     Defendant intentionally discriminated against Plaintiff with respect to the terms, conditions, benefits, and privileges of her employment.

199.     As a direct and proximate result of Defendant's conduct, Plaintiff suffered economic damages, emotional distress, humiliation, reputational harm, physical injury, medical expenses, and other compensable damages.

### COUNT II: DUE PROCESS VIOLATIONS

(Pursuant to 42 U.S.C. § 1983 — Against HCPS, the Board, and Supervisory Defendants)

1. Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

2.  Defendants, acting under color of state law, deprived Plaintiff of her property and liberty interests in continued employment and professional reputation without due process of law.

3.  Plaintiff had a protected interest in not being deprived of her employment status, professional standing, and employment-related benefits through arbitrary, retaliatory, false, or stigmatizing conduct.

4.  Defendant permitted false accusations against Plaintiff to continue, failed to promptly clear Plaintiff's name, allowed Plaintiff to remain under a cloud of suspicion, and permitted the offending parent family to continue influencing Plaintiff's work environment.

5.  Defendant's actions and omissions materially altered Plaintiff's employment conditions, damaged her professional standing, and interfered with her ability to safely perform her job.

6.  Defendant failed to provide Plaintiff a meaningful opportunity to be heard, a fair investigation, a fair corrective process, or adequate procedural safeguards before imposing burdens, restrictions, and adverse consequences upon her.

7.  As a direct and proximate result of Defendant's conduct, Plaintiff suffered economic damages, emotional distress, humiliation, reputational harm, physical injury, medical expenses, and other compensable damages.

**COUNT III: DUE PROCESS VIOLATIONS**
**FAILURE TO PROVIDE FULL AND FAIR COMPENSATION / BAD FAITH**
**HANDLING OF WORKERS' COMPENSATION BENEFITS**

1.  Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

2. Plaintiff suffered serious medical conditions following the November 6, 2023 assault and the December 8, 2023 stroke.

3. Under Maryland law and HCPS employment policy, Defendants owed Plaintiff a duty of good faith and fair dealing in connection with the handling of workplace injury claims, including submission, investigation, and defense of Plaintiff's workers' compensation claim.

4. Defendants breached that duty by failing to timely process, support, or advocate for Plaintiff's legitimate injury and psychological injury sustained in the course of employment.

5. Defendants further acted in bad faith by failing to conduct or cooperate in a fair medical evaluation of Plaintiff's injuries and purporting to file a Workers' Compensation claim that was not actually filed. These acts were intentional, reckless, and in violation of the duty to act in good faith toward an employee seeking lawful statutory benefits.

6. Defendants' bad faith and misconduct deprived Plaintiff of benefits to which Plaintiff was lawfully entitled and exacerbated her emotional and financial suffering.

7. Defendant failed to properly coordinate Plaintiff's medical-leave rights, disability-related accommodation needs, and return-to-work restrictions.

8. Defendant's conduct caused Plaintiff to lose wages, benefits, job security, leave protections, and other employment-related benefits.

### COUNT IV: DUE PROCESS VIOLATIONS
### NEGLIGENT MISREPRESENTATION AND ADMINISTRATIVE NEGLIGENCE IN WORKERS' COMPENSATION PROCESS

1. Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

2. Defendant, through their agents and administrators, made false representations and material omissions regarding Plaintiff's workers' compensation benefits, including the scope of coverage and the fact that her Workers' Compensation claim was denied. Defendants had a duty to communicate accurate information concerning the nature of her injuries, claim status, and appeal deadlines.

3. Defendants breached that duty by failing to inform Plaintiff of truthful representation regarding the filing of her Worker's Compensation claim.

4. As a direct and proximate result, Plaintiff was injured when she lost the ability to pursue full benefits under Maryland's Workers' Compensation Act and has been left without an adequate remedy.

5. Defendants' conduct caused Plaintiff financial hardship, increased medical debt, and further psychological injury.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Mrs. Marchonda Sanders, respectfully prays that this Court grant her the following relief:

a. Enter judgment in favor of Plaintiff and against Defendant;

b. Award compensatory damages in the amount of $750,000 that would fully compensate Plaintiff for the economic loss, medical costs, loss of promotional potential, reputation, lost wages, lost job benefits, physical and psychological injury, humiliation, embarrassment, and severe mental and severe emotional distress caused by the conduct of the Defendant alleged herein;

c. Award punitive damages for willful, malicious, and reckless conduct;

d.  Order injunctive and declaratory relief as appropriate;

e.  Award pre- and post-judgment interest, attorney's fees, and costs; and

f.  Grant such other and further relief as justice may require.

g.  Award Plaintiff reasonable attorneys' fees and costs incurred in this action; and

h.  Order such other relief as this Court deems just and equitable.

## **JURY TRIAL**

Plaintiff requests a jury trial for all issues so triable herein.

Dated: July 11, 2026

Respectfully submitted,

Dionna Maria Lewis, Esq.
District Legal Group, PLLC
Bar No. 19486
700 Pennsylvania Ave, SE, Suite 2098
Washington, D.C. 20003
Phone: (202) 486-3478
Dionna@DistrictLegalGroup.com
*Counsel for Plaintiff*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 10th day of July 2026, a true copy of the foregoing was

electronically filed and served on all parties who were required to be notified via ECF the system.


<u>/s/ Dionna Maria Lewis</u>
Dionna Maria Lewis
*Counsel for Plaintiff*